E-FILED
Tuesday, 17 February, 2026 09:09:39 AM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 24-cr-30041 |
| | ) | |
| AMBROSIA RENICKS,<br>Defendant. | ) | |

## OPINION

**COLLEEN R. LAWLESS, United States District Judge:**

Before the Court are Defendant's Motion for Discovery Related to Selective Enforcement Based on Race (Doc. 14) and Amended Motion for Discovery Related to Racial Selective Enforcement (Doc. 22). For the reasons that follow, Defendant's motions are denied in part and granted in part.

## I.     BACKGROUND

In seeking discovery related to alleged racial selective enforcement, Defendant Ambrosia Renicks argues the overwhelming majority of individuals charged in the Central District of Illinois with wire fraud stemming from applications for loans through the Paycheck Protection Program ("PPP")—a COVID-era government program—are black. At the time of Defendant's Amended Request for Discovery, 95% of the PPP Defendants in the Central District are black. (Doc. 22).

Defendant initially requested the following discovery related to her claim of selective enforcement based on her race: (1) a full list of every PPP case in the Central District of Illinois including the race of each defendant; (2) a list of the agencies referring

those PPP cases to the U.S. Attorney's Office; (3) the factual basis for the investigating agency's decision to pursue or initiate an investigation against each of the individuals listed as defendants in Appendix Exhibit A; (4) all documentation from the agencies produced pursuant to the second request that contains information on how the agency's agents, investigators, and supervisors ensured or checked that they did not screen PPP loan recipients on the basis of race, color, ancestry, or national origin; and (5) all documentation from the agencies pursuant to the second request regarding the criteria those agencies use to determine when to send PPP investigations to the U.S. Attorney's Office. (Doc. 14 at p. 9).

In response to Defendant's initial request, the Government filed the affidavit of Sergeant Justin Spaid of the Springfield Police Department ("SPD"), wherein he explained the basis for the charges against Defendant. (Doc. 21-1). According to Sgt. Spaid, the SPD collaborated with the U.S. Attorney's Office and various federal law enforcement agencies in 2023 to identify individuals in the Springfield community who were believed to be actively engaged in criminal activity. (*Id.* at ¶3). The SPD sought to identify individuals who were on probation or pretrial release and prioritized individuals with previous convictions or pending changes related to weapons offenses, drug trafficking, violent crimes, and/or gang-related activities. (*Id.* at ¶4). The list was generated by crime analysts, detectives, street officers, and sergeants. (*Id.* at ¶5). Sgt. Spaid contends no individuals were referred to law enforcement agencies based on race. (*Id.*).

The FBI then cross-referenced that list of individuals with the database of PPP loan recipients to find those who received PPP loans. (*Id.* at ¶6). SPD used FBI's cross-referenced list to identify individuals who were an ongoing danger to the community based upon criminal history, pending charges, and law enforcement knowledge of criminal activity. (*Id.*). Those who were determined to have fraudulently obtained their PPP loans were referred for prosecution. (*Id.*). Sgt. Spaid attested that four individuals including Renicks were prosecuted in the CDIL after referrals from the SPD. (*Id.* at ¶7).

According to Sgt. Spaid, Defendant was included on the list due to her gang affiliation, previous felony convictions, and pending criminal matters. (*Id.* at ¶8). While the PPP loan investigation was pending, Defendant was on pretrial release in Sangamon County Circuit Court Case No. 2023-CF-442 for Aggravated Battery, Criminal Trespass to a Residence, Criminal Damage to Property, Domestic Battery, and Battery. (*Id.*). Additionally, five months before the Indictment in this case, Spaid arrested Defendant in May 2024 and she was charged in Sangamon County Circuit Court Case No. 2024-CF-589 with Manufacture/Delivery of a Controlled Substance, Aggravated Battery, Aggravated Assault, and Possession of a Controlled Substance. (*Id.*).

After the Court held a motion hearing, Defendant filed an Amended Motion for Discovery based on the information included in Sgt. Spaid's affidavit and addressed at the motion hearing. (Doc. 22). Defendant requested the following information to corroborate the statements in the Government's supplemental response: (1) the list that the SPD produced to the FBI of individuals who "were known or believed to be involved in criminal activity," including its racial composition; (2) any policy and criteria SPD used

to determine whether to add an individual to that "criminal activity" list; (3) the list that the FBI generated of individuals who matched the cross-reference to PPP loan recipients, including, where known, the race of those individuals; (4) any policy that informed the FBI's decision to not investigate that universe of individuals; (5) the list that the SPD generated of PPP loan recipients "who were determined to be an ongoing danger to the community," including its racial composition; (6) any policy and criteria used to determine whether to add an individual to that "ongoing danger" list; (7) and any correspondence between SPD and the FBI related to these lists. (*Id.* at pp. 1-2). Defendant stated that she would withdraw her previously requested materials if the Court granted the amended requests. (*Id.*).

On July 31, 2025, the Court held a status hearing on the amended motion wherein Defendant argued she was entitled to additional discovery because the list addressed by Sgt. Spaid raised more questions than answers. Defendant contends she will review the discovery subject to whatever protective order the Court finds to be necessary — except for discovery being made available only to the Court *in camera*. Defendant argues the *in camera* review of the investigative material is akin to the "classified material" in *TikTok Inc. v. Garland*, 145 S. Ct. 57 (2025) and inconsistent with Fifth and Sixth Amendment principles.[1] However, the Court certainly maintains the ability to review sensitive

---

[1] Defendant quotes a portion of Justice Gorsuch's concurrence in *TikTok* wherein he states, in part, that he is "pleased that the Court declines to consider" the government's classified evidence that has been "shielded from petitioners and their counsel." *See TikTok, Inc.*, 145 S. Ct at 74. In *TikTok*, the Court considered whether the Protecting Americans from Foreign Adversary Controlled Applications Act, which would have effectively banned the TikTok social media platform in the United States, violated the First Amendment. *Id.* at 62-63. Justice Gorsuch spoke only for himself while the analysis in the Court's Per Curiam Opinion was "narrowly focused." *Id.* This Court does not find the two cases to be analogous.

investigative law enforcement material *in camera* to determine whether additional discovery is warranted. *See Taglianetti v. United States*, 394 U.S. 316, 317-18 (1969) (finding the district court's *in camera* examination of electronic surveillance records was procedurally proper); *United States v. Davis*, 793 F.3d 712, 723 (7th Cir. 2015) (keeping portions of an investigation "in camera would respect the legitimate interest of law enforcement in preventing suspects (and potential suspects) from learning how to avoid being investigated or prosecuted."). Defendant did not request the opportunity to question Sgt. Spaid under oath despite multiple offers by the Court to do so.

## II.   DISCUSSION

"The Constitution prohibits selective enforcement of the law based on considerations such as race. . . . The constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause." *Chavez v. Illinois State Police*, 251 F.3d 612, 635 (7th Cir. 2001) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)).

Defendant does not allege selective prosecution, which would involve the prosecutor pursuing similar cases that had been referred differently based on race. *Conley v. United States*, 5 F.4th 781, 789 (7th Cir. 2021). Defendant seeks discovery based on selective enforcement, which occurs when law enforcement "investigate people of one race but not similarly-situated people of a different race." *Id.* Thus, the alleged constitutional violation precedes the prosecutor's involvement and "[it] does not matter if prosecutors then pursue each case equally because the pool of defendants itself was racially selected." *Id.*

A selective enforcement claim contains two elements. The defendant must show that law enforcement's (1) "actions had a discriminatory effect;" and (2) "were motivated by a discriminatory purpose." *Chavez*, 251 F.3d at 635-36; *see also Conley*, 5 F.4th at 789. The standard of proof for a selective enforcement claim is preponderance of the evidence. *Conley*, 5 F.4th at 795-96. While discriminatory effect or disparate impact can be shown by statistical evidence, *see Chavez*, 251 F.3d at 636, discriminatory purpose is more fluid and "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). "A plaintiff must show discriminatory purpose 'in *his* case.'" *Conley*, 5 F.4th at 789 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987)). Discriminatory purpose "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* (quoting *McClesky*, 481 U.S. at 298).

Statistics alone are rarely enough to prove a discriminatory purpose. *Alston v. City of Madison*, 853 F.3d 901, 907 (7th Cir. 2017). Even when relying on statistics, "a plaintiff must always 'point to a defendant's policy or policies causing that disparity.'" *Id.* at 908 (*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 542 (2015)). The Seventh Circuit explained:

> The two leading cases for this are *Gomillion v. Lightfoot*, 364 U.S. 339 (1960) and *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). In *Gomillion*, the state legislature redrew the city boundary from a square to a twenty-eight- sided figure. Redistricting removed 395 of 400 black voters from city limits while no white voter was affected. *Yick Wo* involved a law that prohibited operating a laundromat in a wooden building without a permit. All but one white applicant received a permit but none of the 200 Chinese applicants did.

*Id.* at 908. "The statistics must be so stark that they are 'unexplainable on grounds other than race.'" *Id.* (quoting *Arlington Heights*, 429 U.S. at 266). Such stark data "lead[s] to the inescapable conclusion, 'tantamount for all practical purposes to a mathematical demonstration,' of discriminatory intent." *Id.* (quoting *Gomillion*, 364 U.S. at 341).

In *United States v. Davis*, 793 F.3d 712 (7th Cir. 2015), the *en banc* Seventh Circuit addressed selective enforcement in an appeal involving a plan to rob a stash house. *Id.* at 714. Defendants alleged federal agents used informants and undercover agents to select individuals and present them with "the opportunity to commit a hypothetical lucrative crime" — robbing a nonexistent stash house. *Id.* The federal agent posed as a disgruntled drug courier and told one of the defendants about this opportunity. *Id.* The defendant recruited several others, and they discussed the possibility of killing the stash house guards and undercover agents. *Id.*

The seven defendants in *Davis* (all of whom were black) argued that the prosecutor, the FBI, and the ATF had engaged in racial discrimination in violation of the Equal Protection Clause. *Id.* Defendants informed the district court that, in recent years, the U.S. Attorney had prosecuted 20 stash house stings with 75 black defendants and 19 white defendants. *Id.* at 714-15.

After the district court largely granted the defendants' request for information relating to the investigation and prosecution, the government appealed. *Id.* at 715. The Seventh Circuit held the district court's order allowing discovery was "vastly overbroad." *Id.* at 722. Portions of the order required the disclosure "of thousands (if not millions) of documents generated by hundreds (if not thousands) of law enforcement

personnel," which would "bog down this case (and perhaps the agencies) for years." *Id.* However, the Seventh Circuit explained that "[t]he racial disproportion in stash-house prosecution remains troubling . . . and it is a legitimate reason for discovery provided that the district court does not transgress [*United States v.*] *Armstrong* [517 U.S. 456 (1996)] or an applicable privilege." *Id.* The Court cautioned district courts to proceed in a "measured" fashion and outlined steps the district court should take on remand when addressing the requested discovery. *Id.*

First, a district court should determine whether there is any plausible reason to believe that race played a role in the investigation of the pertinent defendants by reviewing the evidence offered by the defendants. *Id.* In determining whether forbidden selectivity occurred or plausibly could have occurred, the district court should proceed to make limited inquiries, perhaps including affidavits or testimony of the case agents. *Id.* at 723

"If the initial inquiry gives the judge reason to think that suspects of another race, and otherwise similarly situated, would not have been offered the opportunity for a stash-house robbery, it might be appropriate to require the FBI and ATF to disclose, in confidence, their criteria for stash-house stings." *Id.* It is essential "to start with limited inquiries" and "to enlarge the probe only if evidence discovered in the initial phase justifies a wider discovery program." *Id*

Consistent with the steps outlined in *Davis*, this Court must consider whether there is any reason to believe that race played a role in the investigation and referral of Defendant Renicks for prosecution. Defendant relies on charging statistics across the

Central District to raise the reasonable suspicion that race played a role in the investigation of Defendant Renicks. Undoubtedly, the disparity regarding the race of PPP fraud defendants is stark and warranted further inquiry by this Court. That initial inquiry was satisfied by the submission of Sgt. Spaid's affidavit explaining the SPD's collaboration with the U.S. Attorney's Office and other federal law enforcement agencies to identify individuals involved in criminal activity in the Springfield area using race-neutral criteria such as gang affiliation, previous convictions, and pending criminal matters.

For example, in the months preceding the Indictment in this case, Defendant was on pretrial release for various state offenses when she was arrested and charged with new state offenses for controlled substance violations and aggravated battery. Defendant was also affiliated with members of a local gang. Based on that history, she was included on the list of individuals provided to the FBI and eventually referred for prosecution along with three other individuals.

Given the racial disproportion in PPP prosecutions, which is significantly greater than that of the stash-house prosecutions the Seventh Circuit deemed "troubling," *see* *Davis*, 793 F.3d at 722, the Court believes additional "measured steps" are warranted. Upon review of the initial discovery requests, amended requests, and Sgt. Spaid's affidavit, the Court finds an *in camera* review of the lists generated by SPD and cross-referenced by the FBI is appropriate and necessary to determine whether race plausibly played a role in law enforcement's selection of Defendant for prosecution. As specifically noted in *Davis*, keeping certain aspects of law enforcement's investigation *in camera*

Page 9 of 11

respects law enforcement's legitimate interest in preventing suspects and potential suspects from learning how to avoid being investigated or prosecuted. Additionally, the Court grants Defendant's request to assume Defendant's compilation of PPP wire fraud case information is correct as the Government did not correct the data from the case list offered by the Defendant. Thus, Defendant's Initial Request 1 and Amended Requests 1, 3, and 5 are granted.

The Court has considered each of Defendant's discovery requests and finds Sgt. Spaid's affidavit was responsive to Defendant's Initial Requests 2, 3, 4, 5, and Amended Requests 2 and 6 as it relates to Defendant's case and similarly situated defendants charged with wire fraud through referrals from the SPD. The remaining requests are either moot, overbroad, vague, outside the scope of this discovery inquiry, and/or protected by privileges. While many of the topics discussed in Defendant's Initial Request 4 and Amended Requests 2 and 4 could have been discovered through questioning Sgt. Spaid, Defendant declined the opportunity to do so, and the Court finds testimony is unnecessary for its determination of the issues presented. Similar to the discovery requests in *Davis*, Defendant's Initial Requests 3 and 4 and Amended Requests 4 and 7 for "any policy," "any correspondence," and "all documentation" are vague and overbroad.[2] There is no legal obligation to publicly disclose the policies and selection criteria used by law enforcement to determine when and how they investigate certain

---

[2] Defendant states that she modeled Initial Request #3 after discovery request #6 in *Davis*, which she claims the Seventh Circuit left "undisturbed." (Doc. 19 at p. 11). However, the Court did not leave it undisturbed but explained why paragraphs 4 and 5 were inappropriate discovery requests and stated, "[s]imilar things could be said about other paragraphs, but the point has been made. This order is an abuse of discretion." *Davis*, 793 F.3d at 722.

Page 10 of 11

crimes or individuals. *Davis*, 793 F.3d at 722. Furthermore, requesting "any correspondence" and "all documentation" between law enforcement agencies regarding the criteria used to refer over 80 defendants for prosecution is overbroad.

For all of these reasons, Defendant's Motion for Discovery Related to Selective Enforcement Based on Race (Doc. 14) and Amended Motion for Discovery Related to Racial Selective Enforcement (Doc. 22) are granted in part and denied in part. The Government is hereby ordered to provide the documents responsive to Defendant's Amended Requests 1, 3, and 5 for an *in camera* review within 14 days.

ENTER: February 17, 2026

_____
COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE